IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA

      v.                            CRIMINAL NO.: WDQ-11-0303

VICTOR LOPEZ ESCAMILLA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Victor Lopez Escamilla is charged with trafficking in counterfeit immigration and other identification documents. For the following reasons, his motions to suppress a statement and tangible and derivative evidence were denied.

I. Background

On July 22, 2009, Homeland Security Investigations (HSI) special agents came to believe that Lopez Escamilla -- using the names Mango Chupado or Ventura -- was working for a criminal organization (the "Broadway Operation") that made and distributed fraudulent driver's licenses and permanent resident, employment authorization, and social security cards in the 200 block of South Broadway in Baltimore. Aff. in Supp. of Crim. Compl., ECF No. 3 at 3.[1] The 200 block of South Broadway is known as an area where foreign nationals buy fraudulent

---

[1] The Defendant has not challenged the truthfulness of the affidavit in support of the criminal complaint.

documents to conceal their identity and/or unlawful status in this country.  *Id.*

On October 13, 2009, a confidential source identified Lopez Escamilla, who was driving a red Volkswagen Jetta with a Maryland tag.  *Id.*  Maryland MVA records indicated that the car was registered to Lopez Escamilla, whose address was listed as 3711 7th Street, Brooklyn, Maryland.  *Id.*  On October 27, 2009, HSI agents received a photo of Lopez Escamilla from the Maryland MVA, and the confidential informant used it to identify Lopez Escamilla as the person working for the Broadway Operation.  *Id.* at 4.

In the following months, HSI agents observed Lopez Escamilla in the 200 block of South Broadway receiving and distributing two-inch-by-three-inch envelopes.  *Id.*  HSI agents recognized these as the type of small envelopes document vendors use to distribute fraudulent identification documents.  *Id.*  On February 2, 2010, and March 19, 2010, HSI agents photographed Lopez Escamilla distributing such envelopes to Hispanic individuals.  *Id.*

According to the confidential informant, Broadway Operation members learned in the spring or summer of 2010 that Lopez Escamilla was selling fraudulent documents made by a "mill" not owned or operated by the Broadway Operation.  *Id.* The confidential informant told HSI agents that Lopez Escamilla was

using his own mill to avoid paying the wholesale price the
Broadway Operation charged for the fraudulent documents. *Id.*

In December 2010, HSI agents began working with a second
confidential informant who was close to the Broadway Operation.
*Id.* This second informant corroborated the first informant.
*Id.*

On February 7, 2011, a third confidential informant asked
Lopez Escamilla in a monitored phone call to sell him fraudulent
documents. *Id.* at 4-5. Lopez Escamilla said that he could sell
a permanent resident card and a social security card for $100,
and a Maryland driver's license for an additional $100. *Id.* at
5. The informant agreed to contact Lopez Escamilla when ready
to make the purchase. *Id.*

On February 25, 2011, Special Agent Daniel Lopez[2] questioned
a man who had been arrested in Baltimore County for
identification theft. *Id.* The man had been using fraudulent
permanent resident and social security cards, and agreed to give
them to police. *Id.* Agent Lopez saw that the permanent
resident card looked like those sold in the 200 block of South
Broadway. *Id.* The man allowed Agent Lopez to view his cell
phone contacts, and Agent Lopez saw "Ventura" listed for the
number at which the third confidential informant had reached

---

[2] Lopez had nearly 20 years of experience working in immigration
services and homeland security. ECF No. 3 at 2.

Lopez Escamilla. *Id.* The man identified Ventura as a document vendor. *Id.*

On March 3, 2011, agents saw Lopez Escamilla's red Jetta parked at 3711 7th Street in Brooklyn, Maryland. *Id.*

On April 4, 2011, a fourth confidential informant called Lopez Escamilla to ask for fraudulent documents. *Id.* Escamilla said permanent resident and social security cards would cost more than $100. *Id.* On April 5, 2011, the fourth confidential informant set up a meeting to buy fraudulent documents from Lopez Escamilla at a McDonald's restaurant in Glen Burnie. *Id.* Lopez Escamilla said the documents would cost $140. *Id.*

On April 6, 2011, Lopez Escamilla arrived at the McDonald's in the red Jetta and met with the fourth confidential informant. *Id.* Lopez Escamilla drove to an apartment complex across the street to photograph the informant with a camera phone. *Id.* The informant gave Lopez Escamilla half the agreed price, and Lopez Escamilla said the documents would be ready the next day. *Id.* at 5-6.

HSI agents followed Lopez Escamilla after he drove the informant back to the McDonald's. *Id.* at 6. Lopez Escamilla went to a Best Buy store and shopped for computer hard drives. *Id.* Lopez Escamilla then drove to 3711 7th Street in Brooklyn and went inside. *Id.*

4

On April 7, 2011, Lopez Escamilla returned to the McDonald's in the red Jetta and gave the fourth confidential informant a fraudulent permanent resident card and a fraudulent social security card in exchange for the remaining $70 of the agreed price. *Id.*

HSI agents kept Lopez Escamilla under surveillance and learned that the red Jetta was typically parked at 3711 7th Street in Brooklyn. *Id.*

On April 20, 2011, agents learned from a computer investigation that someone named Victor Lopez had been living at 3711 7th Street, using the phone number by which the confidential informants had called Lopez Escamilla, and using a particular social security number. *Id.*

On May 5, 2011, the Court ordered that a GPS tracker be placed on the red Jetta. *Id.* The GPS tracker revealed that the car traveled throughout Baltimore, including the 200 block of Broadway, and returned daily to 3711 7th Street in Brooklyn. *Id.*

On May 12 and 13, 2011, many attempts were made to reach Lopez Escamilla on his phone, but the number had been disabled. *Id.*

On May 17, 2011, agents learned from the Social Security Administration that the social security number used by Victor Lopez was invalid. *Id.* A review of Department of Homeland

5

Security ("DHS") databases revealed no approved visas or entries for Lopez Escamilla. *Id.* at 7.

On May 20, 2011, HSI agents surveilled 3711 7th Street in Brooklyn and saw Lopez Escamilla leave in the red Jetta. *Id.*

On May 24, 2011, Agent Lopez swore to the above facts in a criminal complaint and obtained warrants to search 3711 7th Street and the red Jetta. ECF Nos. 3, 27-1, 27-2. The warrants allowed police to seize records, identification cards, computers, scanners, printers, cell phones, and equipment used to create documents. ECF No. 27-2 at 20-23. The Court also issued a warrant to arrest Lopez Escamilla for immigration violations and document fraud. ECF No. 3 at 1, Ex. 5.

At 6:20 a.m. on May 26, 2011, agents executed the search warrants and arrested Lopez Escamilla, who was asleep when agents arrived. DHS ICE[3] Report of Investigation Continuation, ECF No. 27-4 at 1; Opp'n to Mots. to Suppress,[4] ECF No. 27 at 2. In his bedroom, agents found bills, Lopez Escamilla's personal effects, counterfeit documents, scraps, used ribbons showing documents that had been created, and equipment and supplies used to make counterfeit documents. ECF No. 27 at 2-3. During the

---

[3] Immigration and Customs Enforcement.

[4] Lopez Escamilla provided no factual account of the search or his arrest in his motions, and did not present any evidence at the pretrial hearing. Thus, the Government's version of events is undisputed.

search, Agent Lopez explained to Lopez Escamilla that the Government knew he had been trafficking fraudulent documents, and he would not be asked any questions until he had been read his *Miranda* rights. ECF No. 27-4 at 1. Lopez Escamilla said that he understood. *Id.*

At 6:43 a.m., after Lopez Escamilla had "[gotten] his bearings," he was read his *Miranda* rights in Spanish and given a waiver form in Spanish. *Id.* at 1-2; ECF No. 27 at 3. He acknowledged that he understood, and said that he did not want to speak or sign anything without an attorney. *Id.* Agent Lopez told him that he had the right to remain silent. ECF No. 27-4 at 2. Agent Lopez also said that the Government would want to speak to Lopez Escamilla once he was represented by counsel, and his cooperation could be beneficial to his situation. ECF No. 27-4 at 2. Lopez Escamilla appeared to agree. *Id.*

Later that morning, Agent Lopez transported Lopez Escamilla for booking. *Id.* During the drive, Agent Lopez made small talk, but did not ask any questions about the case. Pretrial Suppression Hr'g Test. Lopez Escamilla said "spontaneously and without questioning that he only sold documents, he did not make documents." ECF No. 27 at 3. Because Lopez Escamilla had invoked his right to counsel, Agent Lopez did not ask any follow-up questions but reminded Lopez Escamilla that the

Government would want to speak to him when he was represented by counsel. *Id.*

On June 1, 2011, Lopez Escamilla was indicted for trafficking in immigration and other identification documents, in violation of 18 U.S.C. §§ 1546 and 1028, and 42 U.S.C. § 408.

On July 26, 2011, he filed motions to suppress his statement, ECF No. 5, and tangible and derivative evidence, ECF No. 6. On February 8, 2012, the Government opposed those motions. ECF No. 27. On February 13, 2012, the Court heard evidence on the motion to suppress Lopez Escamilla's statement to Agent Lopez.[5]

II. Analysis

  A. Motion to Suppress Tangible and Derivative Evidence (ECF No. 6)

Without elaboration, Lopez Escamilla argued that the arrest and seizures of evidence "were made without reasonable suspicion or probable cause." ECF No. 6 at 2. The Government countered that the warrants were "clearly valid on their face," Lopez Escamilla did not dispute anything in Agent Lopez's affidavit, and agents had a good faith basis to rely on the facially valid warrants. ECF No. 27 at 3.

The Fourth Amendment prohibits unreasonable searches and seizures, and no warrant may issue without probable cause.

_____

[5] Defense counsel rested on the motion to suppress tangible and derivative evidence.

8

Probable cause exists for a search warrant when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[6] Probable cause does "not require officials to possess an airtight case before taking action," and officers "must be given leeway to draw reasonable conclusions" from information. *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).

"In reviewing [a] magistrate's probable cause determination, [the Court] must accord great deference to the magistrate's assessment of the facts presented to [her]." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (internal citation and quotation marks omitted). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's

---

[6] *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (internal quotation marks omitted) (*citing Michigan v. DeFillipo*, 443 U.S. 31, 37 (1979)).

decision to issue the warrant[s]." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).[7]

Lopez Escamilla did not show that the arrest or searches were illegal. Both were executed under warrants supported by probable cause. Agent Lopez, who has more than 20 years of experience, established in his affidavit that (1) it was reasonable to believe that Lopez Escamilla had committed document fraud, and (2) there was a fair probability that evidence of that crime would be found in the red Jetta and his home at 3711 7th Street. *See Gates*, 462 U.S. at 238; *Dickey-Bey*, 393 F.3d at 453. Agents had surveilled Lopez Escamilla for months; seen him repeatedly in an area known for the distribution of fraudulent documents; observed him accepting and distributing envelopes of the size used by fraudulent document

---

[7] In addition to the probable cause requirement, a valid warrant must be issued by a "neutral and detached magistrate" and must state with particularity the place to be searched and the items or person to be seized. *See* U.S. Const., amend IV; *United States v. U.S. Dist. of Mich.*, 407 U.S. 297, 316 (1972). When officers rely on a facially valid warrant and the supporting affidavit is later found to lack probable cause, the evidence seized is not subject to the exclusionary rule and is admissible in the Government's case in chief. *United States v. Leon*, 468 U.S. 897, 913 (1984). The evidence will be suppressed only if (1) the issuing judge was misled by information that the affiant knew or should have known was false, (2) the judge "wholly abandoned" her neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is so facially deficient that no reasonable officer could presume it to be valid. *Id.* at 923.

vendors; received and corroborated information from four confidential informants, who said that Lopez Escamilla made and sold fraudulent documents; listened to phone conversations in which Lopez Escamilla agreed to sell false documents; found Lopez Escamilla's phone number in the cell phone of a man arrested for having fraudulent documents; saw Lopez Escamilla shop for computer hard drives immediately after offering to make false documents; observed Lopez Escamilla sell false documents to an informant; linked Lopez Escamilla to the red Jetta, which was parked regularly at the home; learned from a GPS tracker that the Jetta was driven frequently between the home and the area known for the distribution of false documents; and learned that a social security number used by Lopez Escamilla was invalid.

Had Agent Lopez's affidavit lacked probable cause, the evidence seized would still have been admissible. Lopez Escamilla has not shown that Agent Lopez misled the magistrate, the judge was not neutral, the affidavit was so lacking in probable cause as to make belief in its existence "entirely unreasonable," or the warrant was so facially deficient that no reasonable officer could presume it to be valid. *See Leon*, 468 U.S. at 923. The warrants stated with particularity the places to be searched and the items to be seized. For these reasons,

the Court denied the motion to suppress tangible and derivative
evidence.

B. Motion to Suppress Statement (ECF No. 5)

Without elaboration, Lopez Escamilla moved to suppress "any
and all" statements that "he may have made to ICE officers."
ECF No. 5 at 1.  He argued that "these alleged statements were
potentially obtained in violation of the Fourth, Fifth, and
Sixth Amendments."  *Id.*  The Government countered that Lopez
Escamilla's statement that "he only sold documents, he did not
make documents" was "clearly admissible."  ECF No. 27 at 3.

1. Fourth Amendment

Under the "fruit of the poisonous tree" doctrine, "a
confession obtained through custodial interrogation after an
illegal arrest should be excluded unless intervening events
break the causal connection between the illegal arrest and the
confession so that the confession is sufficiently an act of free
will to purge the primary taint."  *Oregon v. Elstad*, 470 U.S.
298, 305-06 (1985) (internal citation and quotation marks
omitted).  Because both the arrest and the searches were
reasonable, *see supra* Part II.A, Lopez Escamilla's subsequent
statement was "not the fruit of any poisonous tree."  *See United
States v. Coleman*, 588 F.3d 816, 821 (4th Cir. 2009).

2. Fifth Amendment

To be admissible, a defendant's statement must comply with two provisions of the Fifth Amendment: the right to due process, and the privilege against self-incrimination.

a. Due Process

A defendant's statement is involuntary and inadmissible under the Fifth Amendment if his "will has been overborne or his capacity for self-determination critically impaired." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (internal citation and quotation marks omitted). "[C]ourts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id*. at 781 (internal citation and quotation marks omitted). A statement is involuntary if it "was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Id*. at 780 (internal citation and quotation marks omitted).

Lopez Escamilla did not show that Agent Lopez threatened him, made any promises, or exerted any improper influence to extract his statement. Thus, he did not show that his statement was inadmissible for lack of voluntariness. *See Braxton*, 112 F.3d at 780.

13

b. Right Against Self-Incrimination (*Miranda*)

To protect a suspect's right against self-incrimination, police must provide *Miranda* warnings[8] before subjecting him to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "If . . . he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Similarly, if he "indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 445.

"If the suspect is not subjected to 'official' interrogation, however, the Fifth Amendment is not implicated." *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007). Interrogation is "words or actions on the part of police officers . . . that they should . . . know[] [are] reasonably likely to elicit an incriminating response." *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (emphasis omitted). "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United*

---

[8] Police must warn the suspect that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

*States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (internal citation and quotation marks omitted).

The admission of Lopez Escamilla's statement does not violate *Miranda*. Agent Lopez read the *Miranda* warnings in Spanish, provided a waiver in Spanish, and honored Lopez Escamilla's decision to remain silent and await counsel. Although Lopez Escamilla was in custody, his statement was voluntary, not the result of interrogation. Agent Lopez's small talk was not reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 302. Because Lopez Escamilla's statement was unprompted and spontaneous, *Miranda* did not require its suppression. *See Rhodes*, 779 F.2d at 1032.

3. Sixth Amendment

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for the defense." This right to counsel, however, "attaches only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia*, 467 U.S. 180, 187 (1984). "The filing of a federal criminal complaint does not commence a formal prosecution." *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006). Nor does the right to counsel attach immediately after arrest. *Id.*

Lopez Escamilla's Sixth Amendment right to counsel had not attached at the time of his statement.  Agent Lopez had filed a criminal complaint, and Lopez Escamilla had been arrested.  But these actions did not initiate adversary judicial proceedings. *See Alvarado*, 440 F.3d at 200.  For all the reasons discussed in this section of this Memorandum Opinion, the Court denied Lopez Escamilla's motion to suppress his statement.

III. Conclusion

For the foregoing reasons, the Court denied Lopez Escamilla's motions to suppress his statement and tangible and derivative evidence.

_____
Date   2/15/12

_____
William D. Quarles, Jr.
United States District Judge

16